**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| DAVID HALPERIN and RAFAEL ROBLES, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KOHL'S, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## I. INTRODUCTION

1. When it comes to cotton bedding, the textile industry has pushed a consistent message: higher thread counts mean a better, smoother, and more luxurious set of bed sheets. The thread count of a set of bedding is therefore highly material to a reasonable consumer. As a result, consumers are willing to pay more money for bedding with higher thread counts based on their reasonable belief that they will receive a premium product, and merchants consistently charge more money for products that advertise a higher thread count.

2. . Defendant Kohl's, Inc. exploited consumers' reasonable belief for its own gain. Kohl's sold 100% cotton bedding labeled with thread counts of 600, 800, 1,000—even 1,500. Those numbers are not just inflated; they are physically impossible. Bedding made of 100% cotton cannot contain more than 600 threads per square inch because the threads are too thick to be woven at that density. Kohl's nevertheless charged premium prices for these impossible thread counts, and consumers paid for a premium product that Kohl's could not—and did not—deliver.

3. Kohl's knew or should have known that its thread count representations were false. There is no possible method for calculating thread count consistent with industry standards, FTC guidance, or the ordinary meaning of the term "thread count" that would yield the thread counts

Kohl's has represented it would provide.

4. Moreover, Kohl's consistently connected its inflated thread count representations to the supposed quality of the bedding, claiming for example that its "high-thread-count sheets" with an "impressive thread count of 800" would ensure "a blend of comfort and opulence," be "exceptionally soft and smooth," and provide "the luxury of premium bedding." *See infra* Part IV.C. This further demonstrates that Defendant's representations were no accident, but rather were the product of an intentional campaign to mislead consumers into paying more money than they otherwise would based on their reasonable belief that they would receive a higher quality product.

5. Plaintiffs David Halperin and Rafael Robles are victims of Defendant's misconduct. They bring this case on behalf of themselves and others similarly situated, seeking damages and equitable relief for Defendant's fraud, negligent misrepresentation, breach of express warranty, unjust enrichment, false advertising in violation of Wis. Stat. § 100.18, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

## II. PARTIES

6. Plaintiff David Halperin is a natural person who resides in Scranton, Pennsylvania, where he intends to remain.

7. Plaintiff Rafael Robles is a natural person who resides in West Chicago, Illinois, where he intends to remain.

8. Defendant Kohl's, Inc. is a Delaware corporation with its principal place of business located at N56 W17000 Ridgewood Drive, Menomonee Falls, WI 53051.

## III. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because at least one member of the proposed Class (including the named plaintiffs) is a citizen of a state different from that of Defendant; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 class members; and none of the exceptions under the subsection apply to this action.

10. This Court has personal jurisdiction over Defendant because its principal place of business is located in Wisconsin, it conducts significant business transactions in Wisconsin, and its wrongful conduct occurred in and emanated from Wisconsin.

11. Venue is proper because Defendant's principal place of business is located in this District. *See* 28 U.S.C. § 1391(b)(1).

## IV. FACTUAL ALLEGATIONS

### A. Inflated thread counts are materially misleading.

12. Textile fabrics are produced by weaving together "threads" or "yarns."

13. Textile products, such as bed sheets, often include representations regarding the "thread count" of the fabric.

14. The term "thread count" has a well-established meaning: the number of threads per square inch in a piece of fabric, measured by adding together the total number of horizontal threads (the "weft") and vertical threads (the "warp"). *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 518, 2381 (1993) (defining "thread count" as "the number of warp yarns and weft yarns per inch in a textile fabric"); NEW OXFORD AMERICAN DICTIONARY 395 (3d ed. 2010) (defining "count" in the context of a fabric as "a measure of the fineness of a woven fabric expressed as the number of warp or weft threads in a given length"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 379 (12th ed. 2026) (defining "count" in the context of a fabric as "the number of threads per square inch in a cloth").

15. A thread can be made from one ply or multiple. A ply is a strand of fiber that makes up a thread. A thread can be either single-ply, meaning that it consists of one individual strand, or multi-ply, meaning that several strands have been twisted together to produce a thread. Either way, the end result is a single thread.

16. When bedding is made of 100% cotton, it is physically impossible for the thread count to reach or exceed 600 because the threads can only be made so fine and only so many threads can fit in a square inch. For single-ply 100% cotton, the maximum achievable thread count is approximately 400 to 500 threads per square inch; a represented thread count of 600 or more is

therefore physically impossible. *See* A.A. Newton, *Thread Counts Are Made of Lies*, LIFEHACKER (Oct. 5, 2022), https://lifehacker.com/thread-counts-are-made-of-lies-1849620461 ("Here's where thread count comes in: The finer the threads, the more of them you can fit into a woven fabric, and the smoother that fabric will feel. But at some point, it becomes impossible to make a single strand of cotton any finer, which means there's a hard limit on how many threads you can weave together. For single-ply cotton, that limit is about 400-500 threads per square inch; if a set of '100% cotton' sheets touts a thread count any higher than that, someone's lying to you.").

17. Franz Kozen, a senior lecturer and director of undergraduate studies at Cornell's Department of Human Centered Design, has explained that "You see sometimes sheets advertised for ungodly numbers of high thread counts, and you think, 'How can they possibly fit 600 threads into this little bit of sheet?'" Jenny McGrath, *A sheet's thread count isn't as important as you think – here's why*, BUSINESS INSIDER (Mar. 24, 2025), https://www.businessinsider.com/guides/home/what-is-a-good-thread-count-sheets?. The answer is that they could not: "A manufacturer could use a double-ply yarn and have 100 yarns going in the weft and warp directions but count it as a 400-thread-count sheet instead of 200. 'So when you see something that says it's a 600-thread-count sheet, my suspicion is that they're counting plies because I can't really see that you could fit 300 yards in it per inch,' said Kozen." *Id.* Thus, "[t]he resulting sheet might have poor airflow and wouldn't necessarily feel more luxurious than 400-thread-count fabric with finer, single-ply yarn." *Id.*

18. Consumer Reports has similarly explained that inflated thread count claims are a "misleading marketing gotcha:"

> Despite the notion that more is better, in our past sheet tests we confirmed that a higher thread count doesn't guarantee better sheets. To uncover the truth behind this misleading marketing gotcha, we talked to our experts.
>
> Thread count is the number of vertical and horizontal threads per square inch. Not long ago, sheets typically had thread counts of 120 with 60 horizontal and 60 vertical threads. In the 1960's, a sheet with a 180 thread count was considered a luxury. "Now you see 1,000 thread count sheets but you just can't get that many threads on a loom," says Pat Slaven, a textile expert at Consumer Reports.

> To get that higher number, manufacturers use thinner strands of fabric twisted together as if they were one. Then they double, triple or even quadruple the thread count to make the number more attractive to the consumer. "It ups the count but doesn't give you a better sheet," says Slaven. "The sweet spot is 400."

Izabela Rutkowski, *Higher thread counts doesn't guarantee better sheets*, CONSUMER REPORTS (Sept. 13, 2013), https://www.consumerreports.org/cro/news/2013/09/higher-thread-count-doesn-t-guarantee-better-sheets/index.htm.

19. Under prevailing industry standards, thread count measurements must include only the number of threads in the fabric—not every ply that comprises a thread. So, for example, an advertisement claiming that a set of bedding has a thread count of 600 represents that the product contains 600 threads per square inch of fabric. If the bedding in fact contained only 300 threads per square inch, the advertisement would be false even if each thread was made of two plies.

20. That standard has been codified by the American Society for Testing and Materials International (ASTM), a non-profit founded in 1898 that has long developed the testing protocols used in the textile industry.

21. In 1998, the ASTM Subcommittee D13.63 on Home Furnishings (the "Subcommittee") issued ASTM D3775, its first stand-alone standard for testing thread count (the "Industry Standard"). Although moved into a separate standard, the test method adopted for calculating thread count did not change from the standard that had long been understood and used in the industry.

22. In adopting ASTM D3775, the ASTM Subcommittee rejected attempts by importers on the Subcommittee to establish a broader industry standard based on tariff regulations that count individual plies.

23. According to ASTM D3775-17, the following is the Standard Test Method for determining a fabric's thread count: "Count the number of ends and picks in five randomly spaced places diagonally across the width of the laboratory sampling unit." ASTM D3775-17, § 9.1.1.

24. As shown in the figure below, the ends (also known as warp yarns) travel lengthwise along the fabric and are the yarns that were originally held in tension on a loom or in a frame, while the picks (also known as filling yarns) travel widthwise weaving over and under the

ends.




25. ASTM D4850-23 defines the following textile industry terminology used in ASTM D3775-17 § 9.1:

- **end**, *n—in woven fabric*, an individual warp yarn (single or ply) or cord.
- **end count**, *n—in woven fabric*, the number of individual warp yarns per inch of fabric regardless of whether they are comprised of single or plied components.
- **pick**, *n—in woven fabric*, an individual filling yarn (single or ply) or cord source.
- **pick count**, *n—in woven fabrics*, the number of individual filling yarns per inch of fabric regardless of whether they are comprised of single or plied components.

26. Therefore, the end count and pick count must only count individual yarns, not each ply in a yarn. As a result, the same is true of thread count, which is the sum of the end and pick count in a given area.

27. Indeed, the ASTM standard thread count test specifically instructs the tester to not count multiple plies when calculating thread count: "When two yarns are laid-in together and parallel, count each yarn separately, as a single unit, regardless of whether it is comprised of single or plied components." ASTM D3775-17 § 9.1.3.

28. ASTM standard test D3775 "has been used extensively in the [textile] trade" for measuring thread count, and "is applicable to all types of woven fabrics," including bedding. *Id.* §§ 1.1, 5.1.

29. Digital thread counters and pick counters are also programmed to comply with the ASTM D3775 Standard.

30. ASTM D3775 is and, at all relevant times, has been generally accepted in the textile industry as the universal Industry Standard for calculating thread count.

31. ASTM D3775 has been accepted by both the American Textile Manufacturers Institute and the National Textile Association as the long-accepted standard in the textile industry for determining thread count.

32. The Federal Trade Commission has explained that ASTM D3775 is an authoritative statement of industry standards. In a 2002 advisory opinion, the FTC responded to an inquiry from the American Textile Manufacturers Institute as to "the appropriate method for determining fabric 'thread count,' or yarns per square inch, in textile products such as bed sheets and pillow cases," and whether it was permissible to "count[ ] yarns within a ply as individual yarns, thus dramatically and deceptively increasing the number of yarns in a square inch of fabric." 2002 FTC Advisory Opinion at 1 (attached as **Exhibit A**). The FTC explained that "[a] thread count claim, like other objective, material claims about a product, must be supported by a 'reasonable basis.'" *Id.* at 2. The FTC further noted that it "has encouraged the use of ASTM tests," and that "relevant consensus based test procedures, such as an ASTM test procedure," are entitled to "great weight in determining whether the advertiser has met its substantial burden." *Id.*

33. The FTC has also confirmed that including the number of plies in a thread count representation is materially misleading to consumers.

34. In a 2005 advisory opinion, the FTC responded to an inquiry from the National Textile Association. *See* 2005 FTC Advisory Opinion (attached as **Exhibit B**). The National Textile Association had stated "that the thread count is an important indicator of fabric quality for consumers who purchase textile bedding products, and that thread count has evolved over time as a key indicator used by consumers to make purchasing decisions." *Id.* at 1. As a result, it was "generally understood that a higher thread count indicates a better product." *Id.* The Association explained that "[t]he common practice in the U.S. textile bedding industry for decades has been to

count the number of threads in both the warp and filling directions," with each yarn "counted as one yarn, regardless of whether the yarn was a single ply or multi-ply yarn." *Id.* The Association further explained that some companies had more recently begun counting each individual ply within a yarn as a separate thread, and that "[t]his practice inflates the thread count numbers to levels which double or triple (or more) the thread count as determined by the long standing, traditional way. This practice has also created confusion in the marketplace and has caused consumers to compare thread counts that may have been calculated in two dramatically different ways." *Id.*

35. In response, the FTC reiterated that "[a] representation about thread count, like other objective, material claims about a product, must be supported by a 'reasonable basis.'" *Id.* at 2. And the FTC explained that a thread count representation that counted multiple plies in violation of ASTM D3775 lacked a reasonable basis and was likely to mislead consumers about the quality of the product: "Based upon the ASTM standard, as well as the information you have provided about standard industry practices with regard to disclosing thread count, we believe that consumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: '300 thread count, 2 ply yarn.' A representation of '600 thread count' for this same product would likely mislead consumers about the quality of the product being purchased." *Id.* at 2.

36. Thus, the practice of artificially inflating thread counts is materially misleading, particularly when done by counting multiple plies in a manner contrary to ASTM D3775. The misleading nature of these claims is exacerbated by the inability of consumers to readily discern the actual thread count of the bedding with the untrained, naked eye.

**B. Reasonable consumers associate higher thread counts with more luxurious bedding, for which they will pay a premium.**

37. Courts have recognized that thread counts are a material factor in consumers' choice of bedding and, accordingly, affect the amount consumers are willing to pay. *See Hawes v.*

*Macy's Stores W., Inc.*, 2022 U.S. Dist. LEXIS 11861, *47 (S.D. Ohio Jan. 22, 2022) ("The Court finds there is more than enough evidence suggesting thread-count is a material factor in consumers' choice of bedsheets.").

38. As the New York Times has noted, "[m]any people assume that higher thread count means higher quality . . . ." Elissa Sanci, *Do Product Specs Matter? Here's Why Thread Count, Lumens, and Wattage Might Be Misleading.* N.Y. TIMES (Sept. 3, 2025), https://www.nytimes.com/wirecutter/reviews/advice-specs/.

39. Consumers are willing to pay more for sheets that they reasonably believe have a higher thread count because those higher thread counts are associated with softer, smoother, and more luxurious bedding than comparable products with lower thread counts.

40. The National Textile Association has noted "that it is generally understood that a higher thread count indicates a better product." **Ex. B** at 1. Moreover, companies that inflate their thread counts gained a competitive advantage from their misleading practice, thus indicating that they were able to charge more money to consumers as a result. *See id.* ("[Y]ou state that some of your member companies have experienced competitive disadvantage by using the traditional method of counting threads and are considering switching to the method of multiplying by the number of plies within a yarn, thus achieving a higher thread count.").

41. Many companies have capitalized on consumers' reasonable belief about the relationship between bedding quality and thread count by inflating their thread counts and charging a correspondingly higher price. Indeed, Shannon Maher, a chairperson and assistant professor of the Home Products Development department at the Fashion Institute of Technology, has explained that companies "raise the [thread count] number to capture customers' attention, since people tend to perceive a higher-thread-count sheet as better." Jackie Reeve, *What Is a Good Thread Count for Sheets?*, N.Y. TIMES (Feb. 7, 2024), https://www.nytimes.com/wirecutter/blog/good-thread-count-for-sheets/.

42. When consumers receive bedding with a lower thread count than was represented, they receive an objectively less valuable product than they were promised.

C. **Kohl's knowingly and falsely represented that 100% cotton bedding had inflated thread counts, thereby overcharging consumers.**

43. Kohl's is a department store that sells bedding in brick-and-mortar stores and online.

44. Every year, Kohl's sells thousands of sets of 100% cotton bedding that are falsely labeled as having thread counts of 600 or more. Each such product is substantially similar in all respects material to this action: each is marketed as 100% cotton, each is labeled or described as having a thread count of 600 or more, and each such representation is false for the same physical reason. The following list contains just a few examples of products from the Kohl's website containing those false advertisements:

- "Simply Vera Vera Wang Pima Cotton 600 Thread Count Sheet Set and Pillowcases" https://www.kohls.com/product/prd-2861368/simply-vera-vera-wang-4-piece-600-thread-count-sheet-set.jsp?color=Steel&topSkuId=74032845

- "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases" https://www.kohls.com/product/prd-3404073/simply-vera-vera-wang-800-thread-count-sheet-set.jsp?color=Charcoal%20Stripe&topSkuId=28889509

- "1000 Thread Count Fresh Home Collection 100% Egyptian Cotton Deep Pocket Dobby Striped Sheet Set" https://www.kohls.com/product/prd-7475324/1000-thread-count-fresh-home-collection-100-egyptian-cotton-deep-pocket-dobby-striped-sheet-set.jsp?color=Silver&topSkuId=63887777

- "SUPERIOR Egyptian Cotton 1000 Thread Count Solid 4-Piece Deep Pocket Sheet Set" https://www.kohls.com/product/prd-8127404/superior-egyptian-cotton-1000-thread-count-solid-4-pc-deep-pocket-sheet-set.jsp?color=White&topSkuId=20274640

- "SUPERIOR Egyptian Cotton 1500 Thread Count Solid 4-pc Sheet Set" https://www.kohls.com/product/prd-7106115/superior-egyptian-cotton-1500-thread-count-solid-4-pc-sheet-set.jsp?color=Taupe&topSkuId=59190238

- "Bibb Home 1000 Thread Count Egyptian Cotton Damask Stripe Sheet Set" https://www.kohls.com/product/prd-7857413/bibb-home-1000-thread-count-

egyptian-cotton-damask-stripe-sheet-set.jsp?color=Grey&topSkuId=75254591

45. Kohl's knew—or, in the alternative, should have known—that these thread count representations were materially false and misleading.

46. Kohl's deviated from well-established industry standards, such as ASTM D3775, for calculating thread count, and Kohl's did so in a manner that served its own financial interests at the expense of consumers. This deviation from an established norm demonstrates that Kohl's acted consciously and deliberately.

47. Kohl's consistently linked its falsely inflated thread count representations to the alleged quality of the bedding. This demonstrates that Kohl's knew its representations would give consumers the mistaken impression that they were purchasing a higher quality product for which Kohl's could charge more money, and that Kohl's fully intended to mislead consumers.

48. For example, consider one of the sets of bedding that Plaintiff Halperin and Plaintiff Robles purchased. As seen in the figure below and at the following link, Kohl's offers for sale on its website the "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases." https://www.kohls.com/product/prd-3404073/simply-vera-vera-wang-800-thread-count-sheet-set.jsp?color=Charcoal%20Stripe&topSkuId=28889509.



49. The "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases" are made of Egyptian Cotton, rather than an artificial fiber such as polyester. Therefore, they could not have a thread count of 800.

50. Kohl's expressly tied its false thread count representation to the quality of the sheets, thereby acting for the purpose of misleading consumers into believing that the bedding was more valuable than it was in reality. As seen below, Kohl's claims that the "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases" are "high-thread-count sheets" with an "impressive thread count of 800," which would ensure "a blend of comfort and opulence," be "exceptionally soft and smooth," and provide "the luxury of premium bedding."

**SIMPLY VERA VERA WANG 800 THREAD COUNT EGYPTIAN COTTON SHEET SET WITH PILLOWCASES**

Indulge in luxury and elevate your bedding experience with the Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set with Pillowcases. Renowned for her elegant and sophisticated designs, Vera Wang brings her signature touch to these high-thread-count sheets, ensuring a blend of comfort and opulence for your bedroom.

Crafted from premium Egyptian cotton with an impressive thread count of 800, these sheets are exceptionally soft and smooth to the touch. The finely woven fabric creates a sumptuous sleeping environment, allowing you to experience the ultimate in comfort and quality.

The set includes a fitted sheet, a flat sheet, and pillowcases, all adorned with Vera Wang's exquisite attention to detail. The fitted sheet's deep pockets ensure a secure fit on mattresses of various sizes, while the flat sheet and pillowcases showcase the refined style that Vera Wang is celebrated for.

Whether you choose the complete sheet set or opt for additional pillowcases to complement your existing bedding, the Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheets exude timeless elegance and provide a sanctuary of comfort for a restful night's sleep. Treat yourself to the luxury of premium bedding and transform your bedroom into a haven of style and serenity.

51. Thus, Kohl's knows that consumers associate higher thread counts with higher quality products and sought to deceive them into believing the thread counts were higher than they were in reality. This allowed Kohl's to charge more money for its products.

52. As another example, consider the bedding set available on the Kohl's website (as seen in the below image and at the following link) called "Bibb Home 1000 Thread Count Egyptian Cotton Damask Stripe Sheet Set." https://www.kohls.com/product/prd-7857413/bibb-home-1000-thread-count-egyptian-cotton-damask-stripe-sheet-set.jsp?color=Grey&topSkuId=75254591



53. As seen above, the “Bibb Home 1000 Thread Count Egyptian Cotton Damask Stripe Sheet Set” is expressly labeled as pure cotton sheets with a 1,000 thread count, which is impossible.

54. Yet, as seen in the following image, Kohl’s again represented that the “sumptuous 1000 thread count” made the sheets more valuable and luxurious:

> **Product Details**
>
> Transform your bedroom into a haven of comfort and style with the Kathy Ireland 1000TC Egyptian Cotton Sheet Set by Luxury Home. This luxurious bedding solution is meticulously crafted to provide a premium sleeping experience, offering the unparalleled luxury of Egyptian cotton combined with the renowned design expertise of Kathy Ireland. Made from 100% Egyptian cotton, these sheets are exceptionally soft, durable, and known for their breathability. With a sumptuous 1000 thread count, you'll experience a level of comfort that's truly remarkable.

55. Defendant continues to market, advertise, and sell 100% cotton bedding sets with falsely inflated thread counts without revealing to consumers the true thread counts of those bedding sets or that its representations are false and misleading and violate the law.

56. Defendant has exploited the fact that consumers cannot readily or economically test thread counts themselves, which would require specialized knowledge, skill, and tools that would require too much time or expense for an individual consumer to pursue for a relatively minor purchase such as bedding.

57. Indeed, consumers have no choice but to trust Defendant to advertise its products truthfully, and they must rely on Defendant’s representations when comparing products and making informed pricing decisions.

58. Inaccurate descriptions of thread counts lead to reasonable but mistaken beliefs by consumers about the products. Indeed, if a package label for bedding states that it contains 600 thread count bedding, no reasonable consumer would believe otherwise.

59. Defendant’s misconduct has caused substantial harm to the public interest. Rampant dishonesty regarding thread counts has created a business environment in which companies feel they have no choice but to continue inflating their thread count representations in order to remain competitive. Defendant has perpetuated a system that has encouraged and led to widespread fraud, deception, illegality, untruthfulness, and unfairness relating to the

merchandising of bedding products.

60. Defendant's illegal business practice should in equity be reformed and enjoined both by providing relief to individual consumers and ordering Defendant to correct the false impression engendered in the Class and the general public by its ongoing deception. Corrective advertising should be ordered to correct the impressions created by the illegal practices in order to fully remedy the wrong done to the Class.

**D. The Named Plaintiffs' Experiences**

**1. Plaintiff David Halperin's Experience**

61. In the past year, Plaintiff Halperin purchased two sets of 100% cotton bedding from Kohl's called "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases." Each set cost $89.99. The label for each set falsely represented that it contained a thread count of 800, when in reality the thread count was far lower. Plaintiff Halperin reasonably believed that the stated 800 thread count was accurate and that the bedding would be of a higher quality than bedding with a lower thread count. Plaintiff Halperin relied on Defendant's misrepresentation when purchasing these sheets and would not have paid as much as he did for each set if he had known the true thread count.

62. In the past year, Plaintiff Halperin also purchased from Kohl's two sets of 100% cotton bedding called "Simply Vera Vera Wang Pima Cotton 600 Thread Count Sheet Set and Pillowcases," one of which was priced at $99.99, and the other at $79.98. The label for each set falsely represented that it contained a thread count of 600, when in reality the thread count was far lower. Plaintiff Halperin reasonably believed that the stated 600 thread count was accurate and that the bedding would be of a higher quality than bedding with a lower thread count. Plaintiff Halperin relied on Defendant's misrepresentation when purchasing these sheets and would not have paid as much as he did for each set if he had known the true thread count. Before purchasing, he reviewed the thread count representation on the product's label and listing and relied on it.

63. As a result of Defendant's misconduct, Plaintiff Halperin has been damaged, as he

paid more for these bedding sets than he would have if he had known their true thread count.

64. Plaintiff Halperin would likely purchase bedding from Defendant again in the future if Defendant began to accurately measure and advertise thread counts, as the proper labeling would allow him to make an informed decision in selecting bedding for different purposes and at different price points.

### 2. Plaintiff Rafael Robles's Experience

65. In the past year, Plaintiff Robles purchased a set of 100% cotton bedding from Kohl's called "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases." Plaintiff Robles paid $121.68. The label for this set falsely represented that it contained a thread count of 800, when in reality the thread count was far lower. Plaintiff Robles reasonably believed that the stated 800 thread count was accurate and that the bedding would be of a higher quality than bedding with a lower thread count. Plaintiff Robles relied on Defendant's misrepresentation when purchasing these sheets and would not have paid as much as he did for the set if he had known the true thread count. Before purchasing, he reviewed the thread count representation on the product's label and listing and relied on it.

66. As a result of Defendant's misconduct, Plaintiff Robles has been damaged, as he paid more for this bedding set than he would have if he had known its true thread count.

67. Plaintiff Robles would likely purchase bedding from Defendant again in the future if Defendant began to accurately measure and advertise thread counts, as the proper labeling would allow him to make an informed decision in selecting bedding for different purposes and at different price points.

## V. CLASS ACTION ALLEGATIONS

68. *Class Definitions.* Under Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs seek certification of a Nationwide Class defined as follows:

> All persons in the United States who, from six years prior to the filing of the complaint through the present, purchased 100% cotton bedding from Kohl's, Inc. that was advertised or marketed as having a thread count of 600 or more.

69. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff Robles seeks certification of the following Illinois Subclass:

> All persons in Illinois who, from six years prior to the filing of the complaint through the present, purchased 100% cotton bedding from Kohl's, Inc. that was advertised or marketed as having a thread count of 600 or more.

70. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff Halperin seeks certification of the following Pennsylvania Subclass:

> All persons in Pennsylvania who, from six years prior to the filing of the complaint through the present, purchased 100% cotton bedding from Kohl's, Inc. that was advertised or marketed as having a thread count of 600 or more.

71. Excluded from the Class and Subclasses are: (a) Defendant and its employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

72. Plaintiffs reserve the right to modify or amend the definition of the proposed class, Class Period, and proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

73. *Ascertainability.* On information and belief, Defendant's sales records identify the customers who purchased 100% cotton bedding that was labeled or described in writing as having a thread count of 600 or more. These records will identify the members of the Nationwide Class and Subclasses. Moreover, to the extent Defendant's records are incomplete, members of the Nationwide Class and Subclasses may self-identify through an administrative claims process.

74. *Numerosity.* On information and belief, Kohl's has sold thousands of 100% cotton sheets during the class period that were advertised or marketed as having a thread count of 600 or more. Kohl's operates stores nationwide, and its customers are geographically dispersed. Therefore, the members of the proposed Class and Subclasses are so numerous that individual joinder is impracticable.

75. *Commonality and Predominance.* This case presents questions of law and fact

common to all class members, and those common questions predominate over any individualized issues. These common questions include:

a. Whether Defendant's representation that its 100% cotton bedding had a thread count of 600 or more was false or misleading;

b. Whether Defendant knew or should have known that its representations were false or misleading;

c. Whether Defendant charged more money for 100% cotton bedding based on inflated thread count measurements;

d. Whether Defendant intended for consumers to rely on its inflated thread count measurements;

e. Whether thread counts are material to a reasonable consumer's decision on which bedding to purchase and how much to pay for it;

f. Whether Defendant's method for measuring thread counts was consistent with ASTM D3775;

g. Whether Defendant's representation regarding the thread counts of its products gave rise to a binding contractual obligation and, if so, whether Defendant breached that obligation;

h. Whether Defendant was unjustly enriched by its deceptive scheme;

i. Whether Defendant's conduct violated Wis. Stat. § 100.18, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

j. Whether Plaintiffs and the Class were injured by Defendant's misconduct;

k. Whether Plaintiffs and the Class are entitled to equitable or injunctive relief; and

l. Whether Plaintiffs and the Class are entitled to damages and in what amount.

76. *Typicality.* Plaintiffs' claims are typical of the proposed Class and Subclasses. Like all class members, Plaintiffs purchased 100% cotton bedding from Kohl's that was marketed or advertised as having a thread count of 600 or more, and they received a product with fundamentally different characteristics and a lower monetary value than what they were promised. There are no unique defenses applicable to Plaintiffs.

77. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class and

Subclasses. Plaintiffs are aware of their fiduciary duties to absent class members and are determined to faithfully discharge their responsibilities. Plaintiffs' interests are aligned with (and not antagonistic to) the interests of the Class and Subclasses. In addition, Plaintiffs have retained competent counsel with considerable experience in class actions and other complex litigation. Plaintiffs' counsel has done substantial work in identifying and investigating potential claims in this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class or Subclasses.

78. *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount in controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

79. *Declaratory and Injunctive Relief.* Defendant has acted or refused to act on grounds that apply generally to the Class and Subclasses—namely, by uniformly misrepresenting an inflated thread count measurement that is factually impossible for 100% cotton sheets. Defendant has also created a uniformly false impression in the Class and general public regarding thread counts that may be addressed through corrective advertising. The final injunctive relief or corresponding declaratory relief will be appropriate respecting the Class and Subclasses as a whole.

## VI. CAUSES OF ACTION

### **Count 1: Fraud**
### **(On Behalf of All Plaintiffs, the Nationwide Class, and All Subclasses)**

80. Plaintiffs reallege all previous paragraphs as if fully set forth herein.

81. Defendant represented to Plaintiffs and the Class on the labeling of Defendant's

product and the listings and descriptions on Defendant's websites that 100% cotton bedding products had a thread count of 600 or more.

82. Defendant made these misrepresentations in writing, on the labels and packaging of the specific products identified above and on the corresponding kohls.com product pages, including the "Simply Vera Vera Wang Pima Cotton 600 Thread Count Sheet Set and Pillowcases" and the "Simply Vera Vera Wang 800 Thread Count Egyptian Cotton Sheet Set and Pillowcases" that Plaintiffs purchased within the past year at the prices alleged above.

83. That representation was false, as 100% cotton bedding products cannot have a thread count of 600 or more.

84. That representation was material, as it directly related to the quality of the bedding.

85. Defendant knew that representation was false. Defendant could only arrive at its inflated thread count totals by implementing a deceptive measuring method that was contrary to well-established industry standards, such as ASTM D3775. No reasonable person would adopt such a method.

86. Defendant intended for Plaintiffs and the Class to rely on that misrepresentation. Indeed, Defendant only adopted its false and misleading method for measuring thread count because it knew how material thread counts are to consumers and intended to deceive consumers into believing that its products had a higher thread count, and thus a greater monetary value, than they truly did. This allowed Defendant to charge higher prices based on inflated thread count measurements.

87. Defendant's misrepresentations preceded each purchase, were extraneous to the contract and were not explicitly addressed by the contract's terms, and were intended to, and did, induce Plaintiffs and the Class to enter into the purchase transactions. Plaintiffs' fraud claim therefore arises from fraud in the inducement and from duties that exist independent of any contract between the parties.

88. Plaintiffs and the Class relied on Defendant's misrepresentation when they purchased 100% cotton bedding products that advertised a thread count of 600 or more.

89. Plaintiffs and the Class acted reasonably by relying on Defendant's misrepresentation. Plaintiffs and the Class had no reason to believe that Defendant had misrepresented the thread count of its products. Plaintiffs and the Class could not have discovered the true thread count without specialized knowledge, tools, or training.

90. Plaintiffs and the Class were damaged as a result of their reliance on Defendant's misrepresentation, as they received a product with fundamentally different characteristics and a lower monetary value than what they were promised. Plaintiffs and the Class would not have purchased that product if they had known that the true thread count was lower than what they were promised, let alone paid full price.

91. Therefore, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, punitive damages, equitable relief, and all other relief allowed by law.

**Count 2: Negligent Misrepresentation**

**(On Behalf of All Plaintiffs, the Nationwide Class, and All Subclasses)**

92. Plaintiffs reallege all previous paragraphs as if fully set forth herein.

93. This claim is pleaded in the alternative to Count 1. Defendant owed Plaintiffs and the Class a duty of care, independent of any contractual duty, arising from Defendant's exclusive and superior knowledge of the true thread counts of its products and from its choice to make public representations about those thread counts.

94. Defendant represented to Plaintiffs and the Class on the labeling of Defendant's product and the listings and descriptions on Defendant's websites that 100% cotton bedding products had a thread count of 600 or more.

95. That representation was false, as 100% cotton bedding products cannot have a thread count of 600 or more.

96. That misrepresentation was material, as it directly related to the quality of the bedding.

97. Defendant was negligent in making that misrepresentation. Defendant could only arrive at its inflated thread count totals by implementing a deceptive measuring method that was

contrary to well-established industry standards, such as ASTM D3775. No reasonable person would adopt such a method. Defendant reasonably should have known that its conduct would deceive a reasonable consumer.

98. Plaintiffs and the Class relied on Defendant's misrepresentation when they purchased 100% cotton bedding products that advertised a thread count of 600 or more. Plaintiffs and the Class would not have purchased that product if they had known that the true thread count was lower than what they were promised, let alone paid full price.

99. Plaintiffs and the Class acted reasonably by relying on Defendant's misrepresentation. Plaintiffs and the Class had no reason to believe that Defendant had misrepresented the thread count of its products. Plaintiffs and the Class could not have discovered the true thread count without specialized knowledge, tools, or training.

100. Plaintiffs and the Class were damaged as a result of their reliance on Defendant's misrepresentation, as they received a product with fundamentally different characteristics and a lower monetary value than what they were promised.

101. Therefore, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, equitable relief, and all other relief allowed by law.

**Count 3: Breach of Express Warranty**
**U.C.C. § 2-313; Wis. Stat. § 402.313; 810 ILCS 5/2-313; 13 Pa. C.S. § 2313**
**(On Behalf of All Plaintiffs, the Nationwide Class, and All Subclasses)**

102. Plaintiffs reallege all previous paragraphs as if fully set forth herein.

103. This claim is pleaded in the alternative to Counts 1–2.

104. Defendant affirmed to Plaintiffs and the Class on the labeling of Defendant's product and the listings and descriptions on Defendant's websites that 100% cotton bedding products had a thread count of 600 or more.

105. Each such affirmation of fact and description of the goods was made part of the basis of the bargain and created an express warranty that the bedding would conform to the affirmation and description, within the meaning of U.C.C. § 2-313 as enacted in Wisconsin, Wis. Stat. § 402.313, and in the other states, including 810 ILCS 5/2-313 and 13 Pa. C.S. § 2313.

106. That affirmation was false, as 100% cotton bedding products cannot have a thread count of 600 or more.

107. The bedding did not conform to Defendant's affirmations and descriptions because its actual thread count was materially lower than represented. Defendant thereby breached its express warranties.

108. That affirmation induced Plaintiffs and the Class to purchase Defendant's products, as thread counts are highly material to the value and quality of bedding. Plaintiffs and the Class would not have purchased Defendant's products if they had known the thread counts were in reality far lower than Defendant had affirmed.

109. Plaintiffs and the Class relied on Defendant's misrepresentation when they purchased 100% cotton bedding products that advertised a thread count of 600 or more.

110. Plaintiffs and the Class acted reasonably by relying on Defendant's misrepresentation. Plaintiffs and the Class had no reason to believe that Defendant had misrepresented the thread count of its products. Plaintiffs and the Class could not have discovered the true thread count without specialized knowledge, tools, or training.

111. Plaintiffs and Class members purchased the bedding directly from Defendant and are in privity with Defendant.

112. Within a reasonable time after they knew or should have known of the breach, Plaintiffs notified Defendant of the breach, including by and through the filing and service of this Complaint. Defendant has at all relevant times possessed actual knowledge of the facts constituting the breach, including the FTC's 2002 and 2005 guidance and the ASTM D3775 standard, and has suffered no prejudice from the timing of any notice.

113. Plaintiffs and the Class were damaged as a result of their reliance on Defendant's misrepresentation, as they received a product with fundamentally different characteristics and a lower monetary value than what they were promised. Plaintiffs and the Class would not have purchased that product if they had known that the true thread count was lower than what they were promised, let alone paid full price.

114. Plaintiffs and the Class are entitled to damages measured by the difference, at the time and place of acceptance, between the value of the goods accepted and the value they would have had if they had been as warranted, together with incidental and consequential damages. U.C.C. § 2-714(2)–(3); Wis. Stat. § 402.714.

115. Therefore, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, equitable relief, and all other relief allowed by law.

**Count 4: Unjust Enrichment**
**(On Behalf of All Plaintiffs, the Nationwide Class, and All Subclasses)**

116. Plaintiffs and the class members incorporate the above allegations as if fully set forth herein.

117. This count is pleaded in the alternative to Counts 1 through 3 and to any claim premised on the existence of an enforceable contract.

118. Plaintiffs and the Class lack an adequate remedy at law.

119. Plaintiffs and the Class conferred a financial benefit on Defendant by paying money for 100% cotton bedding that Defendant represented had a thread count of 600 or more, when in truth the thread counts were far lower. Specifically, Defendant benefited because the transaction priced in Plaintiffs' and the Class's reasonable belief that the bedding had a higher thread count than it did in reality.

120. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and the Class, as it directly collected those payments from them.

121. It would be unjust for Defendant to retain the profits it earned from its misrepresentations regarding the thread counts of its products.

122. Plaintiffs and the Class are entitled to restitution and the institution of a constructive trust disgorging all profits, benefits, and other compensation that Defendant obtained as a result of its wrongful conduct, plus attorneys' fees, litigation costs, and pre-judgment interest.

## Count 5: False Advertising
**Wis. Stat. § 100.18**
**(On Behalf of All Plaintiffs, the Nationwide Class, and All Subclasses)**

123. Plaintiffs and the Class incorporate the above allegations as if fully set forth herein.

124. Defendant is liable for false advertising under Wis. Stat. § 100.18.

125. Defendant publicly advertised, announced, stated, and represented that it was selling 100% cotton bedding with a thread count of 600 or more. Defendant made each such representation to members of the public with the intent to sell its bedding products and to induce consumers to purchase them.

126. Defendant made that public advertisement, announcement, statement, or representation from its Wisconsin headquarters, from where it directed its company-wide scheme to advertise inflated thread counts.

127. That public advertisement, announcement, statement, or representation was untrue, deceptive, and misleading because 100% cotton bedding cannot have a thread count of 600 or more.

128. Plaintiffs and the Class suffered a pecuniary loss as a result of Defendant's advertisement, announcement, statement, or representation, as they received a product with fundamentally different characteristics and a lower monetary value than what they were promised. Defendant's representations materially induced those losses: Plaintiffs and Class members would not have purchased the products, or would not have paid the prices they paid, had the true thread counts been disclosed.

129. Plaintiffs and the Class relied on Defendant's advertisement, announcement, statement, or representation when they purchased 100% cotton bedding products that purportedly had a thread count of 600 or more. Plaintiffs and the Class would not have purchased that product if they had known that the true thread count was lower than what they were promised, let alone paid full price.

130. Plaintiffs and the Class acted reasonably by relying on Defendant's advertisement, announcement, statement, or representation. Plaintiffs and the Class had no reason to believe that

Defendant had misrepresented the thread count of its products. Plaintiffs and the Class could not have discovered the true thread count without specialized knowledge, tools, or training.

131. This claim is brought within three years of the occurrence of Defendant's unlawful advertising and of Plaintiffs' and the Class's pecuniary losses. Wis. Stat. § 100.18(11)(b)3.

132. Pursuant to Wis. Stat. § 100.18(11)(b)2, Plaintiffs and the Class are entitled to damages, costs, reasonable attorney fees, and all other relief authorized by law.

**Count 6: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, et seq.**
**(On Behalf of Plaintiff Robles and the Illinois Subclass)**

133. Plaintiff Robles and the Illinois Subclass incorporate the above allegations as if fully set forth herein.

134. This claim is pleaded in the alternative to Count 5.

135. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact," in the conduct of any trade or commerce. 815 ILCS 505/2.

136. Plaintiff Robles and the Illinois Subclass members are "consumers" within the meaning of 815 ILCS 505/1(e), and Defendant's advertising and sale of bedding occurred in the conduct of "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

137. Plaintiff Robles and the Illinois Subclass Members purchased the bedding at-issue for their use or that of members of their households.

138. Defendant engaged in deceptive acts or practices by labeling and describing its 100% cotton bedding as having thread counts of 600 or more when the actual thread counts were materially lower and when such thread counts are physically impossible for 100% cotton bedding.

139. Defendant's conduct constitutes an unfair practice: it offends the public policy reflected in the FTC's guidance and in ASTM D3775, it is oppressive because consumers cannot

practicably verify thread counts themselves, and it caused substantial injury to consumers that they could not reasonably have avoided.

140. Defendant intended that Plaintiff Robles, Illinois Subclass members, and the consuming public rely on its thread count representations in making purchasing decisions, including by inducing them to pay premiums above those prices charged to consumers for 100% cotton sheets with lower thread counts. The representations were material: higher advertised thread counts command higher prices, and thread count is a key indicator consumers use to compare bedding.

141. Defendant's deceptive and unfair acts occurred in the course of conduct involving trade or commerce in Illinois, among other places: Plaintiff Robles received and acted on Defendant's representations in Illinois, purchased the bedding in Illinois, and suffered injury in Illinois.

142. As a direct and proximate result of Defendant's deceptive and unfair acts, Plaintiff Robles and the Illinois Subclass suffered actual damages: they paid prices they would not have paid, for products worth less than the products promised, had the true thread counts been disclosed.

143. Pursuant to 815 ILCS 505/10a, Plaintiff Robles and the Illinois Subclass are entitled to actual damages, punitive damages, injunctive and other equitable relief, and reasonable attorney's fees and costs.

**Count 7:**
**<u>Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law</u>**
**73 P.S. §§ 201-1, et seq.**
**(On Behalf of Plaintiff Halperin and the Pennsylvania Subclass)**

144. Plaintiff Halperin and the Pennsylvania Subclass incorporate the above allegations as if fully set forth herein.

145. This claim is pleaded in the alternative to Count 5.

146. Plaintiff Halperin and Pennsylvania Subclass members purchased Defendant's bedding primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2(a).

147. Defendant engaged in unfair or deceptive acts or practices declared unlawful by 73 P.S. § 201-3, including by: (a) representing that goods have characteristics, uses, benefits, or quantities that they do not have, 73 P.S. § 201-2(4)(v); (b) representing that goods are of a particular standard, quality, or grade when they are of another, 73 P.S. § 201-2(4)(vii); and (c) engaging in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

148. Plaintiff Halperin and the Pennsylvania Subclass justifiably relied on Defendant's thread count representations. Those representations were objective statements of fact prominently displayed on product labels and product pages; Plaintiff Halperin and Subclass members had no reasonable means of verifying thread counts themselves and no reason to doubt Defendant's representations.

149. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Halperin and the Pennsylvania Subclass suffered an ascertainable loss of money: they paid prices they would not have paid, for products worth less than the products promised, had the true thread counts been disclosed.

150. Pursuant to 73 P.S. § 201-9.2(a), Plaintiff Halperin and the Pennsylvania Subclass are entitled to recover actual damages or one hundred dollars ($100) for each violation, whichever is greater; up to three times their actual damages, in the Court's discretion; and costs and reasonable attorney fees, together with any additional relief the Court deems necessary or proper.

## VII. PRAYER FOR RELIEF

151. Plaintiffs and the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class and Subclasses, appointing Plaintiffs as class representatives, and appointing their counsel as class counsel;

B. Enjoining Defendant from further misstating the thread counts of its products and ordering Defendant to issue corrective advertising;

C. Directing Defendant to disgorge the profits it received from its misrepresentations and awarding restitution to Plaintiffs and the Class;

D. Awarding compensatory and punitive damages in an amount to be determined at trial;

E. Awarding statutory and treble damages as authorized by law, including under 815 ILCS 505/10a and 73 P.S. § 201-9.2(a);

F. Awarding attorneys' fees and costs;

G. Awarding prejudgment and post-judgment interest; and

H. Granting such further relief as the Court deems just and proper.

## VIII. JURY DEMAND

152. Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 5, 2026

Respectfully submitted,

By: /s/ *Matthew R. Wilson*

Matthew R. Wilson
MEYER WILSON WERNING CO., LPA
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066
Email: mwilson@meyerwilson.com

*Counsel for Plaintiffs and the Proposed Class*